UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BENJAMIN M. PHILLIPS, SR., et al., )
)
Plaintiffs, )
)
v. ) Case No. 4:12-CV-02269-HEA
)
THE LELAND STANFORD JUNIOR UNIVERSITY d/b/a STANFORD UNIVERSITY, et al., )
)
Defendants.

**OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Defendant the United States of America's Motion to Dismiss for Lack of Subject-Matter Jurisdiction, [Doc. NO. 165]. Plaintiffs oppose the motion. For the following reasons, the motion will be granted.

**Background**

Plaintiffs bring this putative class action against the United States of America, among others, alleging in their Third Amended Complaint theories of public nuisance, Count I; battery, Count IV; and Recklessness, Count V. Presumably, the claims against the United States are brought under the Federal Tort Claims Act, 28 U.S.C. § 2674 ("FTCA").

Defendant United States filed a motion to dismiss for lack of subject matter jurisdiction. The government maintains that Plaintiffs' claims fall within the discretionary function exception to the FTCA's waiver of sovereign immunity.

## Standard on Motion to Dismiss

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move for dismissal based on lack of jurisdiction over the subject matter. "Dismissal under Rule 12(b)(1) is appropriate if the issue before the court is whether the plaintiff has failed to satisfy a threshold jurisdictional requirement." *Schubert v. Bethesda Health Group, Inc.,* 319 F.Supp.2d 963, 966 (E.D.Mo.2004) (citation omitted). When a court considers a Rule 12(b)(1) motion, it has " 'broader power to decide its own right to hear the case than it has when the merits of the case are reached.' ... Jurisdictional issues, whether they involve questions of law or of fact, are for the court to decide." *Osborn v. United States,* 918 F.2d 724, 729 (8th Cir.1990) (quoting and citing *Williamson v.. Tucker*, 645 F.2d 404, 413 (5th Cir.1981)). Further, "no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Id.* at 730 (citation omitted).

## Discussion

Lawsuits against the United States of America are barred by sovereign immunity unless the United States consents to such suit. *Hercules, Inc. v. United States*, 516 U.S. 417, 422 (1996) (citations omitted). The Eighth Circuit recently summarized the relevant law of sovereign immunity as follows:

> The United States is immune from suit unless it consents. Congress waived the sovereign immunity of the United States by enacting the FTCA, under which the federal government is liable for certain torts its agents commit in the course of their employment.
>
> The United States is, nevertheless, immune if an exception applies. Under 28 U.S.C. § 2680(a), the FTCA does not waive immunity for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."
>
> A two-part test determines when the discretionary function exception applies. First, the conduct at issue must be discretionary, involving an element of judgment or choice. The second requirement is that the judgment at issue be of the kind that the discretionary function exception was designed to shield. Because the exception's purpose is to prevent judicial second-guessing of government decisions based on public policy considerations, it protects only those judgments grounded in social, economic, and political policy.

*Hart v. United States,* 630 F.3d 1085, 1088 (8th Cir.2011) (quoting *Riley v. United States,* 486 F.3d 1030, 1032 (8th Cir.2007) (citations and internal marks omitted)). Where the United States has not waived sovereign immunity under the FTCA, the district court lacks subject matter jurisdiction to hear the case. *Id.* The FTCA's waiver of sovereign immunity is not complete, and contains exceptions. At issue here is the "discretionary function" exception, which provides that no liability shall lie for "[a]ny claim ... based upon the exercise or performance or the

failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see also Herden v. United States,* 726 F.3d 1042, 1046 (8th Cir.2013) (en banc). If the discretionary function exception applies, it is a jurisdictional bar to suit. *Herden,* 726 F.3d at 1046.

A well-established legal framework applies to determine whether the discretionary function exception bars a party's suit under the FTCA. *Id.* This framework was set forth most recently by the Supreme Court in *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The first inquiry is whether the challenged conduct or omission is truly discretionary, that is, whether it involved an element of judgment or choice, or conversely, was "controlled by mandatory statutes or regulations." *Gaubert,* 499 U.S. at 328, 111 S.Ct. 1267. If the challenged conduct is not discretionary, the exception does not apply. *Herden,* 726 F.3d at 1046. If the challenged action is discretionary, however, the second inquiry is whether the government employee's judgment or choice was based on considerations of "social, economic, and political policy." *Id.*

In analyzing whether an alleged act or omission falls within the discretionary function exception, the United States Supreme Court has provided two guiding principles to assist the District Courts. *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). First, the alleged action must

be a matter of choice for the acting employee. *Id.* "[I]f the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." *Id.* at 536, 108 S.Ct. at 1959. Therefore, in order for the discretionary function exception to apply, the government must have made a choice.

The second guiding principle requires a court to determine whether the choice is of the kind that the discretionary exception was designed to shield. *Id.* This inquiry reflects the policy of Congress "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984). When engaging in this second inquiry, a court is to determine whether the judgment is grounded in social, economic, or political policy, and, if the choice is based on such policy considerations, then the discretionary exception will bar the claim. *Dykstra*, 140 F.3d at 795. Therefore, the discretionary exception only insulates the federal government from liability in cases where the government makes a decision based upon considerations of public policy. *Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1959.

Plaintiffs' Third Amended Complaint alleges the following facts:

Defendants cooperated and conspired to participate in and to run a study that was conducted in and around the environs of the Pruitt-Igoe housing complex in St. Louis. Defendants jointly and severally and as co-conspirators along with other conspirators such as the United States Army and other unknown conspirators caused to be sprayed upon the residents and structures of Pruitt-Igoe and surrounding areas of St. Louis chemicals such as zinc cadmium sulfide and other substances believed to be radioactive without the knowledge or consent of those residents. The true purpose of the study is unknown.

The United States, in its memorandum in support of the motion to dismiss, presents the following background:

> In 1942, the Chemical Warfare Service, predecessor to the Army Chemical Corps, assumed responsibility for the government's biological weapons ("BW") research and development program. U.S. Exh. 1, 114 (TOXICOLOGICAL ASSESSMENT OF THE ARMY'S ZINC CADMIUM SULFIDE DISPERSION TESTS, NATIONAL RESEARCH COUNCIL, 114 (1997)); U.S. Exh. 2, 2 ("U.S. Army Activity in the U.S. Biological Warfare Programs, Vol. 1," Department of the Army, Feb. 15, 1977). The BW program pursued an overarching strategic policy of BW deterrence with retaliation if necessary. U.S. Exh. 1 at 114. Because of the limited data and scientific experience available at the initiation of this program, "the policy required extensive research and development to determine precisely [the United States'] vulnerability, the efficacy of [U.S.] protective measures, and the tactical and strategic capability of various [biological warfare] agents and delivery systems." *Id.* In determining how to obtain this information, the Army considered several approaches that weighed military objectives against feasibility and human safety. *Id.* at 115. The central goal of the Corps' BW testing was to determine "the effects of buildings, terrain, meteorological conditions, and so on, on the dispersion of BW agents," both by enemy combatants in the United States and by the United States in enemy territories. *Id.* Consequently, the Corps rejected the possibility of testing

with live agents as unjustifiably dangerous in inhabited areas and incapable of providing necessary information in remote, uninhabited areas. *Id.* at 115-16. It also rejected wind tunnel testing and construction of a simulated target city as inadequate to obtain necessary data and economically infeasible respectively. *Id.*

The Corps eventually determined that the best experimental design to balance all competing interests was dispersion of simulated BW agent replacements in inhabited areas. *Id.* at 116. In order to get the most useful results from these simulant dispersal studies, the Corps' researchers also determined the best test sites, evaluating similarities to Soviet cities of interest, and the best simulants, balancing comparability to BW agents of interest, safety of potentially exposed individuals, and cost. *Id.* at 116-117. In total, from 1941 to 1973 160 BW simulant tests were conducted in 66 locations in the United States and Canada. *Id.* at 119. Throughout the life of this program, "materials that were considered by the scientific community to be safe were selected," and "public safety was stated to be the foremost consideration." *Id.*, *see also* U.S. Exh. 2 at 9 ("Safety and medical aspects in BW R&D as well as testing were always of overwhelming concern…."). In order to protect national security interests, the public was not notified and the program received a high security clearance classification. U.S. Exh. 1 at 118.

Two distinct sets of Zinc Cadmium Sulfide ("ZnCdS") dispersion tests were conducted in Saint Louis. The first ZnCdS study, conducted by the Chemical Corps in 1953 as a classified operation, included 17 field tests with 35 releases of ZnCdS over two areas of the city. *Id.* at 254.

Many potential sites were considered for these dispersion tests based on their similarities in "meteorologic, terrain, population, and physical characteristics [to] the Soviet cities of interest." *Id.* at 117. Saint Louis was selected as a test site based on its climate range, topography, and location on a river, as well as its population, physical infrastructure, and the availability of part-time labor. *Id.* at 117-118.

ZnCdS was selected as the simulant for the Saint Louis study after balancing several competing interests. ZnCdS was well-suited to the Army's information-collecting objective because of its particle size, "stability in the atmosphere," "dispersibility," and "detectable glow." *Id.* at 117. It was also "desirable as a simulant [because of] its economic feasibility." *Id.* Most importantly, ZnCdS was understood to "lack…toxicity to humans, animals, and plants," and to be "an inert material." *Id.* (internal citations omitted).

The second ZnCdS study, conducted by the USPHS between 1963 and 1965 and published in 1966, included seven test series with 42 releases of ZnCdS over two different areas of the city. *Id.* at 187-188, *see also* U.S. Exh. 4, 1-2 ("Public Health Service St. Louis Dispersion Study, Vol. II"). The USPHS selected the Saint Louis metropolitan area to be part of a program of air pollution studies. Saint Louis was considered desirable for the air pollution study because it was reasonably flat; removed from significant topographic features that would influence large-scale air flow; and proximate to weather radar equipment operated by the designers of the study, the Air Resources Field Research Office in Cincinnati, Ohio. U.S. Exh. 3, 2 ("Public Health Service St. Louis Dispersion Study, Vol. I"). The primary purpose of this study was "to describe dispersion over an urban area and to relate the dispersion to meteorological parameters." *Id.* at 1. Once again the researchers chose ZnCdS because of its unique physical qualities which provided a "simple and sensitive method of detection and quantitative evaluation." *Id.* at 5.

The Army ZnCdS experiments were declassified in the early 1990s, leading to concerns among certain populations of citizens and their legislative representatives that unknowing exposure could have contributed to serious health problems. U.S. Exh. 1 at 2. In response, the Army Environmental Hygiene Agency prepared retrospective human health risk reports for ZnCdS exposure in Saint Louis and other cities. *Id.* In 1997, the National Research Council ("NRC") produced an independent toxicological assessment reviewing the Army's original data and subsequent health reports as well as public comment and publicly available data on cadmium toxicity. *See id.* at 1-13. NRC, assuming the worst case scenario, concluded that the risk of cancer and non-cancer disease from exposure to ZnCdS at the levels and for the duration of time present in the dispersion studies was negligible and that a full epidemiological study was infeasible. *Id.* at 79-81, 93. At the time, the NRC noted that the bioavailability of ZnCdS, the degree of breakdown and absorption of ZnCdS components in the body, and ZnCdS's inhalation toxicity, were unknown and should be tested because of the known toxicity of free cadmium. *Id.* at 99. Later studies concluded that ZnCdS does not easily break down into its component elements after inhalation and thus remains poorly bioavailable in the body, protecting against cadmium exposure. *See* U.S. Exh. 5 ("Health Effect of Project SHAD Chemical Agent: Zinc Cadmium Sulfide," The Center for Research Information, Inc. on behalf of the National Academies (2004)).

The government moves to dismiss plaintiffs' claims arguing that the discretionary function exception applies, and therefore, there is no subject matter jurisdiction.

To take advantage of the discretionary function exception, the government must first establish that the challenged conduct "involve[d] an element of judgment or choice." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Here, plaintiff challenges the decision to conduct chemical studies in the St. Louis metropolitan area in the 1950's and 1960's.

The government initially notes that Plaintiffs have failed to allege that the United States was subject to or violated any relevant mandatory or specific regulations, which would prompt the discretionary exception to the FTCA. That having been said, the government goes on to argue that no mandatory and specific regulations constrained the Chemical Corps' conduct of the ZnCdS study or required the Corps to warn St. Louis residents of their possible exposure to ZnCdS as a result of the study. In support of its position, the government submits the 1951 Department of Defense Directive 200.01. DOD 200.1. The Secretary of Defense ordered the three military departments to increase their support of, and participation in projects necessary to bring the United States to the required state of readiness. Additionally, the directive required the military departments to carry out certain recommendations contained in the June 30, 1950 Report of the

Secretary of Defense's Ad Hoc Committee on Chemical, Biological and Radiological Warfare. The Secretary of the Army was given the responsibility too coordinate the three departments' efforts to implement the recommendations. The directive and incorporated recommendations, however, did not dictate a specific course of conduct rising to the level of a mandatory duty for any Chemical Corps personnel that would defeat the discretionary function exception. *Appley Bros. v. U.S.*, 164 F.3d 1164, (8th Cir. 1999). Rather, the directive required the military departments to improve their readiness; study ways and means to provide greater personnel emphasis to the programs; and survey the present status and adequacy of tactical and technical doctrine, principles and concepts for the employment of chemical and biological weapons; and take necessary action to increase the flow of data for the evaluation of chemical and biological agents and munitions. None of the directives imposed any course of action on the Army Chemical Corps.

Nor do the incorporated recommendations contain specific requirements. The agencies are left to their own discretion as to how to implement the recommendations. The recommendations leave to the agencies the design, implementation and coordination of the information program to the discretion of the departments. Plaintiffs have failed to satisfy the first step in the discretionary function exception analysis. If "there was room for judgment or choice in the decision made," then the challenged conduct was discretionary and the Court

proceeds to second step: “evaluat[ing] whether the conduct is of the kind that the discretionary function exception was designed to shield from liability.” *Kohl v. U.S.*, 699 F.3d 935, 940 (6th Cir. 2012)(internal quotation marks omitted). Because the exception’s purpose is “to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,” *United States v. Gaubert,* 499 U.S. 315, 322–23 (1991) (internal quotation marks omitted), “if th[e] action involves choice or judgment that is ‘susceptible to policy analysis,’ then it falls within the discretionary-function exception,” *Kohl,* 699 F.3d at 940 (quoting *Gaubert*, 499 U.S. at 325).

“[W]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent’s acts are grounded in policy when exercising that discretion.” *Id.* (citations omitted). Thus, Plaintiffs must show “that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.” *See Gauhert*, 499 U.S. at 325.

Even if the conduct was discretionary, however, the “‘court must [still] determine whether that judgment is of the kind that the discretionary function exception was designed to shield,’ before concluding that the suit is barred.” *See Demery v. United States Dep't of Interior*, 357 F.3d 830, 833 (8th Cir.2004).

*Id.*, 357 F.3d at 833 (quoting *Berkovitz*, 486 U.S. at 536). "Because the exception's purpose is to prevent judicial second-guessing of government decisions based on public policy considerations, it protects only those judgments grounded in social, economic, and political policy." *Riley v. United States*, 486 F.3d 1030, 1032 (8th Cir.2007) (quoting *C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 796 (8th Cir.1993)). The judgment or decision need only be "susceptible to policy analysis, regardless of whether social, economic, or political policy was ever actually taken into account, for the exception to be triggered." *Demery*, 357 F.3d at 834 (finding the Bureau of Indian Affairs maintenance of an aeration system "lends itself to policy analysis," and therefore the BIA was immune from suit for decisions regarding the maintenance of the aeration system). The plaintiff must rebut this presumption; otherwise, the court will "presume the decision was based on public policy considerations." *Id.* at 833 (quoting *Dykstra v. United States Bureau of Prisons*, 140 F.3d 791, 796 (8th Cir.1998)).

"The planning and execution of [a] research experiment is susceptible to policy analysis, including judgments about how to respond to hazards, what level of safety precautions to take, and how best to execute the experiment in a way that balance[s] the safety needs" of those involved with the need to obtain the experimental goals. *Kohl*, 699 F.3d at 943.

These decisions are issues of policy and susceptible to a policy analysis. *Demery,* 357 F.3d at 833; *C.R.S. v. U.S.,* 11 F.3d 791, 801 (8th Cir. 1993); *see also Rosebush v. United States,* 119 F.3d 438, 443 (6th Cir.1997) ("[D]ecisions whether and how to make federal lands safe for visitors require making policy judgments protected by the discretionary function exception."). The Court finds the ZnCdS tests were grounded in public policy and are discretionary functions excepted from the FTCA's waiver of sovereign immunity.

The contours of the discretionary function cannot be defined with precision, and each case must be analyzed individually. The Court's determination that the tests are discretionary functions excepted from the FTCA's waiver of sovereign immunity is consistent with the Eighth Circuit's decisions analyzing the discretionary function exception. *See, e.g., Hart v. United States,* 630 F.3d 1085 (8th Cir.2011) (finding Bureau of Indian Affairs officer's decisions regarding how and when to restrain arrestee fell within discretionary function exception); *Riley v. United States,* 486 F.3d 1030 (8th Cir.2007) (finding the USPS's choice of curbside delivery at a dangerous intersection balanced considerations of personnel, efficiency, economy, and safety and fell within discretionary function exception); *Demery,* 357 F.3d at 830 (finding BIA's maintenance of aeration system at lake, and the warnings associated with the danger of open water, fell within the discretionary function exception).

Plaintiffs strenuously argue that the Court should allow discovery prior to resolution of the motion to dismiss. As the government points out, however, the information Plaintiffs seek is contained in the national archives, just as available to Plaintiffs as Defendant United States. Likewise, Plaintiffs' request for a hearing on the issue is unavailing. The Court has considered the extensive briefing on the issue and has heard argument of counsel regarding the propriety of dismissal. No further hearing on the matter is required for the Court to conclude that the challenged governmental actions fall within the discretionary function exception to the Federal Tort Claims Act. The Court concludes that it lacks subject matter jurisdiction over Plaintiffs' claims against the United States.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to dismiss for lack of jurisdiction, [Doc. No. 165], is granted.

Dated this 22nd day of April, 2015.

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE